IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Sammie Giles, Jr., Ph.D.,                                    Case No. 3:04 CV 7643

                                   Plaintiff,                MEMORANDUM OPINION
                                                             AND ORDER

                    -vs-
                                                             JUDGE JACK ZOUHARY
The University of Toledo, et al.,

                                   Defendants


        This is an employment discrimination case in which Plaintiff alleges violations of Title VII,

28 U.S.C. §§ 1981, 1983, and 1985, Ohio Rev. Code § 4112 and Ohio common law.  The Court has

jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  This matter is before the Court on

Defendants' Motion for Summary Judgment (Doc. No. 59),[1] and Plaintiff's Motion for Partial

Summary Judgment (Doc. No. 76).  Defendants' Motion is granted and Plaintiff's Motion is denied.

                                        FACTS

        Plaintiff, an African-American professor, was employed at the University of Toledo's College

of Engineering from 1987 until March 2006.  Plaintiff was granted tenure in Academic Year (AY)

1991-92.  Defendant University of Toledo (University) is a state-supported university in Ohio.

Individual Defendants are as follows:  Daniel Johnson, University's former President; Alan

Goodridge, former Provost; James Sciarini, current Vice President for Human Resources; and

Ganapathy Naganathan, Dean of the College of Engineering.

---
[1]

Defendants' Motion is more accurately called a Motion for Partial Summary Judgment.  Pursuant to the
telephone conference held on June 20, 2005, the Court ordered the discovery and motions bifurcated; first
addressing Count One (denial of Plaintiff's leave) and then Count Two (hostile work environment).

In 1998, Plaintiff applied for an open position as the College of Engineering's Electrical Engineering Chair, but was denied the opportunity to interview because he was not a full professor. Plaintiff applied for the position of Department Head of the Electrical Engineering Department at Tuskegee University in Alabama (Tuskegee) in 2000, was offered the position and accepted. He requested an unpaid leave of absence from the University for "at least two calendar years - three years would be optimum" from Ron Fournier, Dean of the College of Engineering at the time (Def. Ex. A). Plaintiff requested this leave commence January 1, 2001, and asked for up to three years because Tuskegee was undergoing a review by the Accreditation Board for Engineering and Technology, which is normally a three-year process (Giles Aff. ¶ 9). Fournier supported Plaintiff's request and forwarded it to the Provost (Fournier Aff. ¶ 8).

Dr. Earl Murry, the University's Vice Provost for Faculty Development, discussed the request with Plaintiff and Fournier (Murry Aff. ¶ 13). Murry believed Plaintiff's experience at Tuskegee "would assist both Dr. Giles in his professional development and, ultimately, the University of Toledo in making some progress under its Affirmative Action Plan" (Murry Aff. ¶ 13). Murry advised Plaintiff his leave was approved for up to three years, but that "he should submit annual paperwork so the University could do necessary budgeting of his now available salary" (Murry Aff. ¶ 15).

Murry's November 2000 confirmation letter to Plaintiff only approved one year, and advised that if a second year was necessary, Plaintiff should make "another request at that time and the matter will be decided administratively with respect to other considerations affecting the University" (Giles Dep. Ex. B). To explain the discrepancy between his written approval of one year and verbal approval of up to three years, Murry cited his difficulties at the time with the University's Faculty

2

Senate (Murry Aff. ¶ 16). Murry feared a three-year approval would be seen by the faculty as racial favortism (Murry Aff. ¶ 15).

In December 2000, Murry confirmed with Plaintiff's attorney that his leave had been approved, effective January 1, 2001. In September 2001, Plaintiff submitted the paperwork for a second year of leave (Giles Dep. Ex. TTT). Plaintiff was again approved, effective January 1, 2002 (Giles Dep. Exs. D, E).  In July 2002, Plaintiff submitted paperwork for a third year of leave. Defendants Naganathan, Goodridge and Sciarini jointly denied Plaintiff's request in September 2002 because, pursuant to Section 14.3.1 of the 2000-03 Collective Bargaining Agreement (CBA) between the University and the University of Toledo Chapter of the American Association of University Professors (UT-AAUP) (Giles Dep. Exs. P, Q), leaves of absence were limited to two years. Naganathan was aware of Murry's earlier oral approval of a three-year leave of absence, but this did not change the University's determination that the CBA prohibited the additional year (Murry Aff. ¶ 22; Giles Dep. Ex. P).  Plaintiff was then informed of his teaching assignments for the semester beginning January 2003 (Giles Dep. Ex. WWW).

In October 2002, Tuskegee advised Plaintiff that Tuskegee was granting him tenure, and in December Plaintiff informed the University that he would not be returning (Giles Dep. 115).  A few days later, Plaintiff gave Naganathan a letter offering three methods of separation from the University: retirement; an additional year of leave; or resignation (Giles Dep. 117-20; Giles Dep. Ex. LL1-4). Plaintiff stated, "I leave the matter in the hands of The University of Toledo" and "I would most prefer the new leave-of-absence route, and I absolutely least prefer the resignation route. A combination of leave of absence and retirement would also be acceptable to me" (Giles Dep. Ex. LL1).

3

The University believed it could not give three years of leave under the CBA and Plaintiff was not yet eligible for retirement under the Ohio Public Employees Retirement System (Giles Dep. 145). Therefore, the University accepted Plaintiff's resignation by e-mail on December 25, 2002. However, on December 26, President Johnson received a letter (dated December 24) from Plaintiff withdrawing his resignation and requesting sick leave for the spring semester 2003 (Giles Dep. 148-49, 157-60). The University accepted the retraction and Plaintiff remained a University faculty member (Giles Aff. ¶ 19).

Naganathan's denial of a third year of leave and attempted acceptance of Plaintiff's resignation allegedly caused Plaintiff emotional distress (Giles Aff. ¶ 20). His emotional distress, his desire to avoid retaliatory conduct by Naganathan, and an ill family member prompted Plaintiff to take leave under the Family Medical Leave Act (FMLA) (Giles Aff. ¶ 20). The University granted Plaintiff FMLA leave until May 2003 (Giles Dep. Ex. TT), although Plaintiff continued to work at Tuskegee during this leave (Giles Dep. 153).

In June 2003, Kevin West, who had been Murry's intern and was now handling some of Murry's duties while he was on administrative leave, sent Plaintiff a letter advising him that his FMLA leave ended in May 2003, unless he provided documentation of re-evaluation. Without a re-evaluation, Plaintiff would be required to return to the University in August 2003 and, if he did not return, he would face termination (Giles Dep. Ex. TT). In July 2003, Plaintiff notified the University that he would not return to teach (Giles Dep. Ex. UU). Because Plaintiff did not return, the University notified Plaintiff, in October 2003, that it was beginning corrective action procedures according to the terms of the CBA.

4

In November 2003, Plaintiff and University officials held a conference call to discuss his faculty position (West Dep. Exs. 6A, 6B, 7).  Plaintiff was unable to provide a reasonable date for his return (West Dep. 64-65).  Later that month, Plaintiff e-mailed West and Naganathan indicating he "would like to retire from the Ohio system a little later," because his daughter just started medical school and he "would like to return to UT within the next four (4) years."  He also inquired about a possible liaison position from the University to Florida A&M University and Tuskegee (Giles Dep. Ex. WW).

West responded that Plaintiff's continued refusal to return to the University constituted insubordination and job abandonment, and notified him that the University scheduled a pre-disciplinary hearing to address these charges on December 22, 2003 (Giles Dep. Ex. XX).  Plaintiff was unable to make the December hearing because he wanted to hire an attorney, and the University agreed to work with Plaintiff to reschedule the hearing for early January (Giles Dep. Ex. ZZ).  When West did not hear from Plaintiff by early January, West rescheduled the hearing for January 20.  Plaintiff did not respond or attend (Giles Dep. Ex. AAA).  West then sent Plaintiff a deadline of February 4 to coordinate a new hearing date, but Plaintiff still did not respond; West again rescheduled the hearing, this time for April 2 (Giles Dep. Ex. CCC). Finally, on March 30, West heard from Plaintiff's attorney who requested a delay until May and also requested a large number of documents from the University (Giles Dep. Ex. DDD).

The University provided Plaintiff with the requested documents, numbering thousands of pages, and the hearing continued to be delayed.  All the while, Plaintiff continued to teach at Tuskegee.  In mid-2005, a year and a half after disciplinary proceedings began and two years after Plaintiff was supposed to return to his position, Plaintiff offered to return to the University to teach

5

(Giles Aff. ¶ 26). However, Plaintiff had been suspended "pending conclusion of the disciplinary process" (*Id.*; Naganathan Dep. 148-49).

The pre-disciplinary hearing was finally held on October 20, 2005. Provost Goodridge presided over the hearing, despite Plaintiff's objections and requests for recusal (Giles Aff. ¶ 24). Goodridge recommended Plaintiff's dismissal, finding Plaintiff was insubordinate and abandoned his job (*Id.* at ¶¶ 23-24; West Aff. Ex. A). After reviewing Goodridge's recommendation and the record, President Johnson issued a notice of dismissal on March 17, 2006 (West Aff. Ex. B).

During the long delay for the pre-disciplinary hearing, Plaintiff twice filed charges with the Equal Employment Opportunity Commission (EEOC), but the EEOC was "[u]nable to conclude that the information obtained establishes violations of the statutes" (Amended Complaint ¶¶ 11, 12, 15, 16). After receiving notices of dismissal and his right to sue from the EEOC, Plaintiff filed the instant action in October 2004 (Doc. No. 1). After his termination from the University, Plaintiff filed an Amended Complaint in June 2006 (Doc. No. 46).

### SUMMARY JUDGMENT STANDARD

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

6

**Application of the CBA Agreement**

At the outset, the Court addresses Plaintiff's assertion that neither the 1998-2000 nor the 2000-03 CBAs between the University and UT-AAUP apply to Plaintiff.  Defendants' legitimate, nondiscriminatory reason for denying Plaintiff's third year of leave is based upon the 2000-03 CBA, and Plaintiff's Motion for Partial Summary Judgment asks for summary judgment on Defendants' Eleventh Affirmative Defense, which states the CBA limits unpaid leaves of absence to two years. Specifically, Plaintiff asserts that neither CBA was in effect when his first year of leave was granted on January 1, 2001, and therefore the two-year limit is inapplicable to Plaintiff.

CBA Facts

The University and UT-AAUP have been parties to CBAs since 1993 (Murry Dep. 54).  All subsequent CBAs have contained similar language regarding leaves of absence (Giles Dep. 49-50). Significantly, while the section numbering was changed, the pertinent language in the sections discussing leaves of absence were identical and state in pertinent part:

> Members may request leave of absence without pay for any purpose mutually agreed to by the University and the member. Such leave shall normally be for one (1) calendar year or less, but may be extended by mutual agreement of the University and the member. Such leave shall not exceed two (2) calendar years. Ultimate authority to grant such leave is discretionary with the Board. Ninety (90) days before the expiration of such a leave members must indicate in writing to their department chairperson, or other equivalent supervisor, their intention of returning to work. Once granted, a leave of absence may be shortened only at the discretion of the University. A request for such leave shall not unreasonably be denied. (2000-03 CBA, Section 14.3.1).

The 1998-2000 CBA was set to expire on June 30, 2000 (1998-2000 CBA, Section 25.0). As the expiration date approached, the University and the UT-AAUP agreed to a "Mutually Agreed-Upon Dispute Settlement Procedure" (MAD), and extended the 1998-2000 CBA until December 31,

7

2000. In the fall of 2000, the parties negotiated a new CBA with some issues submitted to a fact-finder who issued a report on December 3, 2000. A few days later, the Union members voted to accept the report, as did the University's Board of Trustees. The CBA was "agreed upon and ratified" on December 7, 2000, with its terms retroactive to July 1, 2000. While the 2000-03 CBA was ratified in early December, it was on January 16, 2001 that the CBA was finalized and signed.

CBA Law and Analysis

Plaintiff claims the date to determine CBA applicability is January 1, 2001, when he began his leave of absence, and that since no CBA was then in force, the two-year leave of absence limitation does not apply to him. He argues (1) the 1998-2000 CBA ceased being effective either on June 30, 2000, because the parties did not have the authority to extend its applicability through the MAD, or alternatively on December 31, 2000 if the MAD's extension is valid, and (2) the 2000-03 CBA did not become effective until January 16, 2001, leaving a gap in CBA coverage from, at least, December 31 until January 16.

Defendants make several arguments in support of their position that either the 1998-2000 CBA or the 2000-03 CBA was in effect over Plaintiff's leave. First, they state the 2000-03 CBA was effective on December 7, 2000, because that is the ratification date as stated in the CBA itself, and because that is the date the parties approved the CBA in its entirety. Second, they claim the effective date of the 2000-03 CBA, as stated in the CBA, is July 1, 2000, a retroactive date. Third, Defendants cite Ohio Administrative Code Section 4117-09-02(E), the Ohio State Employment Relations Board, and Ohio common law, to suggest that, even without an extension of the 1998-2000 CBA under the

8

MAD, the 1998-2000 CBA would be extended to cover Plaintiff's leave.[2]  Finally, Defendants argue that Plaintiff is essentially challenging the denial of this third year of leave, not the University's grant of the first two years of leave, and the third year was denied in 2002, a date clearly covered by the 2000-03 CBA.

The Court finds that, whichever date is used to determine CBA applicability (the date Plaintiff's first request for leave was formally approved, the date he left on leave, or the date his third request for leave was denied), Plaintiff was covered by one of the CBAs, both of which provided "leave shall not exceed two (2) calendar years."

In *Local 377 Chauffeurs, Teamsters, Warehousemen, & Helpers of America v. Humility of Mary Health Partners*, 296 F. Supp. 2d 851, 859 (N.D. Ohio 2003), the court reviewed a similar fact pattern.  The first CBA (CBA I) expired May 9, the alleged incident occurred on May 15, the parties ratified the successor CBA (CBA II) on May 22, and the finalized agreement was executed the following February.  Despite the dates of certification and execution, CBA II was "back-dated" effective May 10.  Defendant then made the same argument as Plaintiff here; namely, CBA I had expired and CBA II did not become effective until it was executed much later, therefore no CBA covered the alleged incident.  The court rejected this argument *(Id.* at 859) and held:

> . . . it is apodictic that a collective bargaining agreement becomes effective on the date the parties select.  In addition, it is a well-settled principle of contract interpretation that a contract must be interpreted when possible as a whole in a manner which gives reasonable meaning to all its parts and avoids conflict or surplusage of its provisions.

---

[2]

Because the Court finds the 2000-03 CBA covered Plaintiff at all pertinent times, the Court does not need to address the validity of the MAD's extension of the 1998-2000 CBA.  It is worthwhile to note, however, that even if the extension itself is invalid, when parties mutually agree to continue as if the CBA was in force, the *status quo* continues.  *Young v. Washington Local Sch. Dist. Bd. Of Educ.*, 85 Ohio App. 3d 37 (1993).

(citing *Mail-Well Envelope v. International Ass'n of Machinists & Aerospace Workers, Dist. 54*, 916 F.2d 344, 346 (6th Cir. 1990); *International Union v. Yard-Man, Inc*., 716 F.2d 1476 (6th Cir. 1983); *Cincinnati Typographical Union No. 3, Local 14519 v. Gannett Satellite Info. Network, Inc*., 17 F.3d 906, 909 (6th Cir. 1994)).  The court further held that if it found the execution date to be the effective date, the holding would "nullify an expressly stated provision of the contract.  Such a result is an impermissible manner of contract interpretation." *Id.* at 859-60 (citing *Maurer v. Joy Technologies, Inc*., 212 F.3d 907, 918 (6th Cir. 2000)).  The court also noted that using the execution date as the effective date would force the court to find the parties ignored any gap between CBA I and CBA II and operated during the gap without a governing CBA, despite CBA II's express language otherwise. *Id.* at 860.

The Court agrees with the holding in *Local Chauffeurs*.  The Sixth Circuit has recognized there is no law limiting authority to make provisions of an agreement retroactive. *Mail-Well Envelope*, 916 F.2d at 346-47.  In fact, such a situation is not uncommon. *See Hovey Elec., Inc. v. N.L.R.B.*, 22 Fed. Appx. 509, 517-18 (6th Cir. 2001); *Watson Wyatt Corp. v. SBC Holdings, Inc.*, 438 F. Supp. 2d 746, 753 n.11 (E.D. Mich. 2006); *Board of Trustees of Ohio Laborers' Fringe Ben. Programs v. Akron Insulation & Supply, Inc.*, No 2:03-CV-902, 2005 WL 1705173, at *2-3 (S.D. Ohio, July 20, 2005); *Ste. Marie v. City of Dayton*, 109 F. Supp. 2d 846, 848 (S.D. Ohio 2000).

Here, the 2000-03 CBA clearly expresses the parties' intent to make the agreement retroactive. Interpreting the 2000-03 CBA's effective date as January 16, 2001 would directly contradict their intention.  It is also clear the parties took precautions to avoid any gap in CBA coverage because they agreed in the MAD to extend the previous CBA and made the 2000-03 CBA effective the day after the 1998-2000 CBA expired.

10

Therefore, the 2000-03 CBA was in effect beginning on July 1, 2000.  Murry's alleged approval in the fall of 2000 of a three-year leave of absence beginning on January 1, 2001, and subsequent denial of the third year of leave in 2002, are all dates during which the agreement was effective.[3]

Plaintiff next argues that even if the 2000-03 CBA was retroactively effective at the time Murry granted Plaintiff's leave and when Plaintiff took leave, he held a vested right to a leave of absence greater than two years and vested rights cannot be retroactively revoked. *Ebert v. Stark County Board of Mental Retardation*, 63 Ohio St. 2d 31, 34 (1980).

Plaintiff never had a vested right to a three-year leave of absence.  To determine if a right vests, the Court must look to the intent of the parties. *Golden v. Kelsey-Hayes Co*, 73 F.3d 648, 654 (6th Cir. 1996).  The Court should first try to determine intent from the explicit language of the agreement, applying the basic rules of contract interpretation. *Yard-Man*, 716 F.2d at 1479; *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 580 (6th Cir. 2006).  The intent for the right to vest does not need to be explicit, and if ambiguities exist, the Court should look to extrinsic evidence including the parties' implied terms, practice, usage and custom. *Maurer*, 212 F.3d at 915.

In the fall of 2000, when Murry orally approved a three-year leave, the 1998-2000 CBA was still in effect, due to the MAD extension.  If the right to three years vested at Murry's oral approval, the approval was subject to the 1998-2000 CBA, Section 14.3, which specifically provides that "authority to grant such leave is discretionary with the Board," that the University may shorten the

---

[3] Plaintiff argues that after he took leave in January 1, 2001, he was no longer subject to the 2000-03 CBA because he was not "tenure track or full-time tenured faculty." This argument too is contrary to the language of 2000-03 CBA.  Section 14.3.1 does not indicate that once the faculty member goes on leave he is no longer bound by the CBA.  To the contrary, it includes provisions governing the faculty member's return to the University at the conclusion of leave.

leave at its discretion, and that "[a] request for such leave shall not unreasonably be denied." Nowhere does it suggest that leaves are an earned benefit or a vested right. Therefore, Murry's oral approval and the commencement of the leave did not create a vested right under the 1998-2000 CBA.

If, as Plaintiff argues, no CBA was in effect, the Court must look to the intent of the University. As noted above, the leave of absence was not earned, but was granted to Plaintiff at the University's discretion. In its November 2000 letter to Plaintiff, the University indicated Plaintiff would need to reapply for his second year of leave, which the University would grant or deny depending upon the current circumstances. This clearly implies Plaintiff did not have a vested right to a second year of leave, let alone a third year. Even without a binding CBA, the intent of the University was not to guarantee a right to three years of leave.

Therefore, the Court finds the 2000-03 CBA did not retroactively deprive Plaintiff of a pre-existing vested right, there was no violation of due process of law, and the two-year leave limitation was applicable to Plaintiff.

### Race Discrimination: Disparate Treatment

The Court now turns to the Title VII claims. Plaintiff alleges the University discriminated against him because of his race when it denied him a third year of leave, and that non-minority faculty members were granted three years of leave "for comparable reasons under similar collective bargaining agreement language" (Complaint ¶34). In order to establish a prima facie claim, Plaintiff may introduce direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because neither party suggests that direct evidence has been presented in this case, the Court will focus on whether Plaintiff has established an inference of discrimination through circumstantial evidence.

12

Circumstantial evidence can be used to raise an inference of discrimination by applying the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  A prima facie case of discrimination exists if Plaintiff can show he: (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the position; and (4) was replaced by a person outside the class, or was treated differently than similarly-situated, non-protected employees. *DiCarlo*, 358 F.3d at 415.

If Plaintiff can establish a prima facie case of discrimination, Defendants must articulate some legitimate, nondiscriminatory reason for Defendants' action. *DiCarlo*, 358 F.3d at 414.  If Defendants satisfy this burden, Plaintiff must prove Defendants' reason was a pretext for discrimination. *DiCarlo*, 358 F.3d at 414-15.  Pretext can be established by showing Defendants' reason: (1) had no basis in fact; (2) did not actually motivate the decision to terminate; or (3) was insufficient to warrant the decision to terminate. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Prima Facie Case

Plaintiff meets the first element of a prima facie case because he is an African-American male. The second element requires Plaintiff to suffer an adverse employment action.  An adverse employment action is an action that amounts to "'a materially adverse change' in the terms or conditions of employment." *Freeman v. Potter*, 200 Fed. Appx. 439, 442 (6th Cir. 2006). "[T]he action must have a 'significant detrimental effect' on the employee's status as evidenced by objective factors, not subjective impressions." *Id.* at 442-43 (citations omitted).  Neither party disputes that the denial of leave is an adverse employment action.  The denial of a third year of leave, if others are granted such leave, may have a "significant detrimental effect" on Plaintiff's employment status.

13

The third element of a prima facie case is Plaintiff's qualification for his position with Defendants.  To be qualified for a position, an employee must meet the employer's legitimate expectations and perform to the employer's satisfaction. *See Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000).  The reasons for termination cannot also be used to disprove Plaintiff's qualifications.  The Sixth Circuit has held that the discharge justification cannot be used as evidence that Plaintiff is not qualified. *Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 585 (6th Cir. 2002).  The discharge justification should only be considered in the later stages of the *McDonnell Douglas* test. *Id.* at 585.  There is no indication that Plaintiff was unqualified for his position as a professor of engineering.  Therefore, the third element is also met.

The final element in a prima facie case of racial discrimination is that non-protected, similarly-situated persons were treated differently than Plaintiff.  An exact correlation between the two employees is not necessary; Plaintiff need only show that they are similar in all relevant aspects. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998); *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002).  Relevant aspects to consider include whether the employees "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff fails to identify a non-protected similarly-situated person whom the University treated better than himself.  At the time his unpaid leave of absence was granted by University officials, Plaintiff was subject to a binding CBA.  According to Plaintiff, faculty members Hugh Hinton, Bulford Lively, Ms. Shaeferstien, David Balzer, M. Sami Kassam, Peter Linebaugh, and John

14

Monoky were similarly-situated but treated better (Pl.'s Opp. 17-21).  In order to be similarly-situated, these persons need to be similar in "all of the relevant aspects." *Ercegovich*, 154 F.3d at 352.

Balzer and Kassam were faculty members who took leaves of absence in the 1970s and 1980s, well before the first CBA in 1993.  They were, therefore, not limited to a two-year leave of absence under the provisions of the later CBAs.  Because Balzer and Kassam were granted leave under different standards, they cannot be similarly-situated to Plaintiff.

Likewise, Monoky was not granted a three-year leave under a CBA.  Monoky took an unspecified number of years of leave prior to the 1993 CBA.  Monoky's last leave of absence was during AY 1992-93.  Once the new CBA was adopted, the University informed Monoky that the CBA limited further leaves.  Rather than return, Monoky retired.  Monoky was never granted leave under a CBA agreement, and he was therefore not similarly-situated to Plaintiff.[4]

Plaintiff also names Shaeferstien as a similarly-situated person who, according to Plaintiff, was a female employee who moved to New York and was denied an unpaid leave, but whom the University continued to pay (Pl.'s Opp. 21 n.43 (citing Murry Dep. 108-109)).  There is no evidence she was granted three years of leave, of any type, and therefore she cannot be considered similarly-situated but treated better than Plaintiff.

Linebaugh, another allegedly similar faculty member, took half a year on sabbatical and half a year on a leave of absence in AY 2000-01, taught at the University during AY 2001-02 (he sought

---

[4] Plaintiff argues that Monoky was allowed to retire rather than return, while Plaintiff's attempt to retire was denied by Naganathan.  But Plaintiff alleges he was denied a third year of leave because of his race, not that he was denied retirement when others were allowed to retire.  Even if Plaintiff raised this claim, he fails to show that Monoky was similarly-situated.  Naganathan believed Plaintiff's age and years of service did not make him eligible for retirement under the Ohio Public Employees Retirement System (Giles Dep. 145), and Plaintiff offers no evidence of Monoky's age or number of years of service.

and was approved for a leave of absence for spring semester 2002, but withdrew his request), spent AY 2002-03 on an unpaid leave of absence, and applied for an additional year of leave in AY 2003-04. The University approved Linebaugh's leave for AY 2003-04. This approval for a second consecutive year of leave of absence was consistent with Section 14.3.1 of the 2000-03 CBA. The University granted him exactly two consecutive years of unpaid leave of absence, the maximum amount allowed under the 2000-03 CBA. Therefore, Linebaugh was not treated differently from Plaintiff.

Two of the allegedly similar employees, Hinton and Lively, had three or more years of leave approved, but neither had more than two consecutive years approved. Hinton took one year of leave of absence, followed by one year on sabbatical, and then two years of leave of absence. Lively took a half year on sabbatical, two years on a release with partial pay, and a year and a half sick leave, after which he was removed due to disabilities.

Plaintiff urges the Court to consider sabbaticals, partial pay, sick leave, and leaves of absence as the same, because "[t]he essence of a 'leave' for a teaching employee is that he is excused from teaching duties for its duration" (Pl.'s Opp. 17). The Court finds the types of leave have meaningful differences and, for the reasons set forth below, the two-year limitation in the CBA was only intended to apply to leaves of absence. Thus, for the purpose of determining who is similarly-situated to Plaintiff, it is appropriate to consider only those persons who have been granted more than two consecutive years unpaid leave of absence.

*1. Combining Sabbaticals and Other Forms of Leave is Not Appropriate*

Leaves of absence without pay may be granted for "any purpose mutually agreed to by the University and the member" (2000-03 CBA 14.3.1). These leaves are normally for one year or less,

16

but may be extended up to two years. *Id.* In any event, the "leave shall not exceed two (2) calendar years." *Id.*

Sabbatical leaves, on the other hand, are paid leaves and may be granted after seven years of service and again every seventh year after a sabbatical is taken. *Id.* at 14.6.1.  The CBA contains no explicit limitation on the length of the sabbatical.  They are designed for the member to "pursue interests which contribute to the member's professional development through research, study, writing, or the acceptance of special assignments or fellowships and similar activities which will enhance the performance of the member's academic duties." *Id.* at 14.6.2.  Sabbaticals cannot be used when being paid as a faculty member by another U.S. college or university or to "complete requirements for a higher degree." *Id.* at 14.6.2.2.  While sabbaticals may be taken for a foreign teaching assignment or recognized grant, the member's salary during the sabbatical is reduced by the amount received from the grant or foreign salary. *Id.* at 14.6.2.1.

The 2000-03 CBA also includes separate provisions for sick leave, vacation, medical leave, jury duty, and holidays. *Id.* at 14.1, 14.2, 14.4, 14.5, 14.7.  For example, sick leave is paid leave and can be used for a number of personal and immediate family injuries and illnesses. *Id.* at 14.1.3, 14.1.5. The number of sick days available depends on the length of service, but if an absence exceeds fifteen days, a release from a physician is required to return to work.

To determine whether the types of leave have relevant differences for the purposes of defining which persons are similarly situated, the Court looks to the 2000-03 CBA's explicit language. *Golden*, 73 F.3d at 654.  The CBA defines and treats each type of leave separately, with separate limitations, restrictions and benefits for each specific type of leave.  The only types of leave that specify a two-year limitation are unpaid leaves of absence and medical leaves, and medical leaves are further

17

distinguished because they require physician recommendations and a justifiable state of health. Because the two-year limitation is Defendants' basis for denying Plaintiff's leave extension, the CBA's treatment of different leaves indicates meaningful distinctions between unpaid leaves of absence and other forms of leave.

The CBA does not treat leaves as interchangeable. Rather, the CBA sets forth provisions which apply to a specific leave, and only that leave. The Court refuses to determine that the two-year limitation on leaves of absence in Section 14.3 includes unpaid leaves of absence, sick leave, and sabbaticals, a conclusion which would expressly contradict the CBA's clear language. *Golden*, 73 F.3d at 654 (courts "should interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties . . . . The aim in such cases is to settle on an interpretation which is harmonious with the entire agreement."). Accordingly, faculty members such as Hinton and Lively, who were approved for other types of leave, are not similarly-situated to Plaintiff.

Plaintiff fails to show a prima facie case because he cannot show that similarly-situated persons were treated differently from Plaintiff. And, even if Plaintiff made a prima facie case of discrimination, he fails to satisfy the rest of the *McDonnell-Douglas* analysis.

<u>Legitimate, Nondiscriminatory Reason</u>

Once Plaintiff establishes a prima facie case of discrimination, Defendants must articulate a legitimate, nondiscriminatory reason for Plaintiff's termination. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). Defendants only have a burden of production, not a burden of persuasion, and this Court does not undertake a credibility analysis of Defendants' reason. *Id*.

18

Defendants denied Plaintiff's third year of leave because the CBA required such leaves not to exceed two calendar years.  Defendants have satisfied their burden by providing evidence of the 2000-03 CBA's limitation, which qualifies as a legitimate, nondiscriminatory reason, and the burden now shifts back to Plaintiff.

Pretext

To establish that the stated reason was a pretext for discrimination, Plaintiff must provide "sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer*, 29 F.3d at 1083.  Pretext can be established by showing that a defendant's reason: (1) had no basis in fact; (2) did not actually motivate the decision to terminate; or (3) was insufficient to warrant the decision to terminate. *Id.* at 1084.  "A plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff 'must produce sufficient evidence from which the jury may reasonably reject the employer's explanation.'" *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999) (citing *Manzer*, 29 F.3d at 1083).

The first  method of proving pretext is to show the nondiscriminatory reason had no basis in fact.  To prove pretext under this method, Plaintiff must show more than a dispute about the underlying facts.  "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

Plaintiff asserts he was not covered by a CBA and that Defendants knew the CBA did not apply to him.   Plaintiff argues he has, therefore, shown pretext because Defendants' nondiscriminatory reason had no basis in fact and they had no honest belief in the proffered reason.

19

Because this Court finds the 2000-03 CBA applies to Plaintiff, the Court also finds Defendants' proffered reason has a basis in fact.  Therefore, Plaintiff fails to establish pretext under the first method.

The second method of proving pretext is to show the reason did not actually motivate the decision to terminate.  "To establish pretext under the second *Manzer* method, the plaintiff admits the factual basis underlying the discharge and acknowledges that such conduct *could* motivate the dismissal, but attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was *more* likely than that offered by the defendant.'" *Smith v. Leggett Wire Co.*, 220 F.3d 752, 759 (6th Cir. 2000) (citing *Manzer,* 29 F.3d at 1084).  "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Manzer,* 29 F.3d at 1084.  Plaintiff would have to show that, even if the 2000-03 CBA applied to him, it was more likely than not that Defendants terminated him because of his race.  The weight of circumstantial evidence in this case is insufficient to show the University's explanation is more likely than not a pretext.  Plaintiff fails to show Defendants were actually motivated by racial animus and fails to establish pretext under the second method.

The final method of showing pretext is to prove the nondiscriminatory reason was insufficient to warrant the denial of leave.  This method usually consists of "evidence that other employees . . . were not fired even though they engaged in substantially identical conduct." *Id.* at 1084.  Plaintiff would have to provide evidence that other parties under substantially identical situations were granted leave.  The compared employees must have "nearly identical" situations and be similar in all relevant aspects. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994).

20

As noted above, the Court already considered other employees identified by Plaintiff and found they are not similarly-situated in all relevant aspects.  Plaintiff therefore fails to provide evidence of pretext under the third, and final, method.  In sum, Plaintiff fails to establish a prima facie case and that Defendants' reason for denying his leave was mere pretext. For these reasons, his claim for race discrimination under Title VII fails.

**Retaliation**

Title VII also prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).   Plaintiff may establish a prima facie case of retaliation by showing that:

1. he engaged in an activity protected by Title VII;
2. Defendants knew of his exercise of his civil rights;
3. thereafter, Defendants took an employment action adverse to him; and
4. there was a causal connection between the protected activity and the adverse employment action.

*Randolph v. Ohio Dept. Of Youth Services*, 453 F.3d 724, 736 (6th Cir. 2006).  Once Plaintiff establishes a prima facie case of retaliation, the burden of production shifts to Defendants to articulate a legitimate, nondiscriminatory reason for its actions.  *Canitia v. Yellow Freight Sys., Inc*., 903 F.2d 1064, 1066 (6th Cir. 1990).  The burden then shifts back to Plaintiff to demonstrate that the proffered reason is a pretext.  *Id*.

Plaintiff established the first three elements of a prima facie case of retaliation.  He filed a suit under Title VII, a protected action; Defendants knew he filed the action; and he was subsequently

21

terminated, an adverse employment action.  The Court now turns to the fourth element, a causal connection between Plaintiff's filing of a Title VII action and his termination from the University.

"A causal link requires the plaintiff to proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (citations omitted); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action").  "Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly-situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* at 563.

Plaintiff asserts a causal connection exists because Defendants did not complete their disciplinary investigation and terminate his employment until after he filed his Complaint.  Only then was Plaintiff denied his request for teaching assignments in the fall of 2005, Goodridge chosen to preside over his pre-disciplinary hearing, and Plaintiff terminated for insubordination and job abandonment.[5]  Plaintiff also asserts that, but for retaliation for filing the Complaint, he might have received only progressive discipline (not termination), and the President might have decided to speak with Plaintiff or Murry about the situation.  It is Plaintiff's contention that deciding whether the foregoing actions were retaliatory or merely coincidental is a question for a jury.

---

[5]

Plaintiff also attempts to argue that the University might not have decided as early as mid-2005 that it would never allow him to return to the University.  However, this argument is based on Paragraph 27 of Plaintiff's Affidavit, which is stricken under Federal Civil Rule 56(e) as a statement not based upon personal knowledge and inadmissible hearsay.

22

In contrast, Defendants argue that the filing of this lawsuit cannot shield Plaintiff from disciplinary action that is the "logical consequence" of ignoring direct orders to return to work following expiration of his approved leave.  Defendants assert, in particular, the lack of evidence of other faculty members who refused to return to work after the completion of their leave and who were not terminated for their refusal. Finally, Defendants dispute that Plaintiff has a right to a full evidentiary hearing and a "neutral" decision maker.

The Court finds Plaintiff has not shown similarly-situated faculty members were treated differently from Plaintiff, nor has Plaintiff shown temporal proximity between his protected action and his adverse employment action.

First, Plaintiff's disciplinary process began because he abandoned his position.  Plaintiff has not identified any other faculty members accused of job abandonment and insubordination for the Court to compare to Plaintiff.  The two faculty members that Plaintiff states received no punishment or simply a reprimand, David Erben and Abid Al-Marayati, were not similarly-situated.  Erben was a faculty member terminated for research misconduct but reinstated after a grievance arbitrator found procedural errors in Erben's disciplinary proceedings.  Erben was not disciplined for a similar violation and therefore his discipline cannot be compared to Plaintiff's termination.[6]  Al-Marayati,

---

[6]

Plaintiff also cites the arbitrator's decision in Erben's case for the proposition that a Provost is not an impartial hearing officer and that in "the University's recent history no Provost (other than Goodridge) has ever served as the hearing officer for a faculty member's pre-disciplinary hearing" (Pl.'s Opp. 24 n.44). In Erben's case, however, Provost Free (Plaintiff inexplicably refers to Henry Moon as the presiding hearing officer, contrary to the arbitration record), had opposed Erben's tenure track appointment and, prior to the hearing, had received every document from the inquiry and investigation into Erben's misconduct.  For those reasons he was not impartial, not because of his position as Provost.  Moreover, Section 17.3 of the 2000-03 CBA does not require an "impartial" decision maker, but simply requires an "[e]mployer representative, who has not previously participated in the investigation at issue."  Without further evidence of Goodridge's impartiality or participation in the investigation, the simple fact that he was Provost is insufficient.  Additionally, Plaintiff cites no record support for the University's alleged historical refusal to use Provosts as hearing officers.

allegedly insubordinate but not disciplined, was later assigned classes (Pl.'s Opp. 27), but Plaintiff fails to explain how Al-Marayati was insubordinate or whether University officials, other than Murry, were aware of the insubordination, or how Al-Marayati is similarly-situated to Plaintiff. The record does not allow the Court to conclude the denial of teaching assignments in mid-2005 or the eventual termination would not have occurred but for Plaintiff's filing of the Complaint.

Second, Plaintiff has not shown temporal proximity between his termination and his protected action. The University began disciplinary proceedings in December 2003. Due to Plaintiff's requests, and delays, the hearing was necessarily postponed. In March 2004, during this lengthy delay, Plaintiff filed this Complaint. Also during the delay (and over a year after filing the Complaint), Plaintiff requested an assignment of classes at the University, which the University denied. The pre-disciplinary hearing did not occur until October 2005 and, after an independent review, President Johnson informed Plaintiff of his dismissal in March 2006. None of the events alleged by Plaintiff to be retaliatory closely followed his filing of the Complaint. The refusal to let him return to teaching classes was over a year after his Complaint was filed, the hearing presided over by Provost Goodridge did not occur until a year and a half after the filing, and the dismissal was two years after the Complaint was filed. These lengths of time are insufficient by themselves to establish a causal connection in a prima facie case of retaliation. *See Nguyen*, 229 F.3d at 567 (causal connections based on proximity of time require short periods of time, usually less than six months). Again, the evidence provided is insufficient to conclude the University would have acted differently but for Plaintiff's Complaint.

Plaintiff additionally argues that the University deviated from the provisions of the 2000-03 CBA in its discipline of Plaintiff. He asserts the CBA required progressive discipline, not

termination, and he would have received a milder form of discipline but for his protected action. Section 17.1 of the CBA states in pertinent part:  "[t]he Employer shall not impose discipline except for just cause.  The employer subscribes to the principles of progressive discipline except in instances where summary action is called for."  The CBA recognizes summary action may be appropriate, and here there is no record evidence that termination is not appropriate for the charges against Plaintiff. Quite the contrary, it is difficult to imagine how the University would effectively discipline Plaintiff through reprimands or suspension when Plaintiff refused to return to the University.

Since Plaintiff fails to offer sufficient evidence to raise an inference that his protected action was the likely cause of the University's adverse actions against him, Plaintiff fails to establish a prima facie case of retaliation.  Summary judgment in favor of Defendants, therefore, is granted on Plaintiff's retaliation claim.

**Section 1981 Claim**

Count Four of the Amended Complaint alleges Defendants violated 42 U.S.C. § 1981 by depriving Plaintiff of the right to make and enforce contracts enjoyed by white faculty members (Complaint ¶ 41).  Defendants allegedly deprived Plaintiff by unilaterally interpreting the CBA in a way it had never before been interpreted and in a manner inconsistent with the University's past practice, as well as, continuing to approve three or more years of leave for other faculty members. *Id.* Plaintiff also alleges that Defendants Goodridge and Johnson violated 42 U.S.C. § 1981 by recommending termination and terminating him from the faculty. *Id.*

The same *McDonnell-Douglas* analysis applied to claims arising under Title VII are applied to claims under 42 U.S.C. § 1981. *Mitchell*, 964 F.2d at 582.  As the Court determined Plaintiff failed to show similarly-situated persons to establish a prima facie case under Title VII, so too does Plaintiff

fail to establish a prima face case for a 42 U.S.C. § 1981 violation.  Summary judgment in favor of Defendants is granted on Count Four.

**Section 1983 Claim**

Count Five of the Amended Complaint alleges the University unilaterally interpreted the CBA, adopted its interpretation of the CBA as policy, subsequently and pretextually applied the policy to Plaintiff, and deprived Plaintiff of his due process rights in his pre-disciplinary hearing.  Plaintiff alleges these University actions deprived him of his rights and privileges in violation of 42 U.S.C. § 1983.

A state's sovereign immunity, derived from the Constitution and confirmed by the Eleventh Amendment, bars all suits against States by its own citizens, citizens of another state, or foreign citizens, except where the State waives immunity or Congress abrogates the immunity. *Alden v. Maine*, 527 U.S. 706, 728-29 (1999); *Thiokol Corp. v. Dep't of Treasury, State of Michigan, Revenue Div.*, 987 F.2d 376, 381 (6th Cir. 1993). "[A]rms of the state" also possess immunity and the "jurisdictional bar applies regardless of the nature of relief sought." *Northern Ins. Co. of New York v. Chatham County, Ga.*, ___ U.S. ___, 126 S.Ct. 1689, 1693 (2006); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984), *overruled in part on other grounds by Will v. Michigan Dept. Of State, Police*, 491 U.S. 58 (1989).

State universities are "arms of the State" and are immune from Section 1983 suits unless the State consents to the suit, or Congress abrogates the States' sovereign immunity as they have for Title VII claims. *Id.* at 99; *Quern v. Jordan*, 44 U.S. 332, 344-45 (1979); *Hutsell v. Sayre*, 5 F.3d 996 (6th Cir. 1993).  There is no indication that the State of Ohio or the University consented to this suit, nor has Congress abrogated the immunity for Section 1983.  Under Section 1983 "a plaintiff must allege

26

the deprivation of a constitutional right caused by a person acting under color of state law." *Bell v. Ohio State University*, 351 F.3d 240, 248 (6th Cir. 2003). Neither states nor their officials acting in their official capacities are "persons" under Section 1983, and Congress has not acted to abrogate a state's immunity. *Will*, 491 U.S. at 71. Therefore, The University is immune from Section 1983 claims.

Although Plaintiff argues that the individual Defendants were also included in Count Five, Plaintiff does not allege Section 1983 violations by the individual Defendants. The Count focuses solely on the University's alleged actions and the allegation that the University subjected Plaintiff to deprivation of his rights and privileges (Amended Complaint ¶ 43). Nowhere in the Count are the individual Defendants mentioned.

Nonetheless, Plaintiff contends he sufficiently pled claims against the individual Defendants to satisfy notice pleading and points to his incorporation of the previous forty-one paragraphs into Count Five (Amended Complaint ¶ 42). However, the previous paragraphs do not indicate Section 1983 claims are brought against the individual Defendants. The only arguably relevant statements are: Defendants Sciarini and Goodridge applied the two-year limitation on leaves of absence to Plaintiff; and their interpretation was promulgated by the University (Amended Complaint ¶ 25). Even under notice pleading, this is insufficient to place the individual Defendants on notice that a Section 1983 claim was brought against them. (See Federal Civil Rule 8(a) requiring "a short and plain statement of the claim showing that the pleader is entitled to relief.") Additionally, the Court notes that when Plaintiff wished to accuse the individual Defendants, he did so clearly and specifically (*see* Amended Complaint ¶¶ 36, 39, 41, 45, 47, 49). The Court finds Plaintiff did not

plead a cause of action under Section 1983 against the individual Defendants and summary judgment in favor of these Defendants is granted on Count Five as well.

**Section 1985**

A civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Weberg v. Franks*, 229 F.3d 514, 526 (6th Cir. 2000). "Without an unlawful action causing injury, [Plaintiff] cannot prove the elements required to support a claim for conspiracy." *Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir. 2004). As Plaintiff fails to show Defendants committed an unlawful action, Plaintiff cannot prove the elements of civil conspiracy. Summary judgment on Count Six is granted in favor of Defendants.

**Ohio Rev. Code Chapter 4112**

The same analysis applied to Title VII claims is applied to claims arising under Ohio Rev. Code Chapter 4112. *Little Forest Med. Center of Akron v. Ohio Civ. Rights Commission*, 61 Ohio St. 3d 607, 609-10 (1991). As the Court stated above, Plaintiff fails to establish a prima facie case under Title VII. Therefore, Defendants are entitled to summary judgment on Count Seven.

**Ohio Public Policy**

To bring a tort claim for wrongful discharge in violation of public policy, the employee must have been an employee at-will. *Haynes v. Zoological Society of Cincinnati*, 73 Ohio St. 3d 254, 258 (1995). Plaintiff was not an employee at-will, but rather was a tenured faculty member covered by the 2000-03 CBA. Plaintiff claims he "migrated out" of the CBA when he became a full-time employee at Tuskegee, but, as noted earlier, this is contrary to the express language of Section 14.3.1 of the CBA which details the procedure for a faculty member to return from a leave of absence, and the express language of Section 14.3.3 which states what benefits the member retains while on leave.

28

Plaintiff remained a faculty member while on leave and remained subject to the 2000-03 CBA.  He was not an employee at-will. Therefore, summary judgment is granted in favor of Defendants.

### Plaintiff's Motion for Partial Summary Judgment

Plaintiff's Motion for Partial Summary Judgment (Doc. No. 76) requests this Court to find Plaintiff is entitled to judgment as a matter of law on Defendants' Eleventh and Fourteenth Affirmative Defenses.

Defendants' Eleventh Defense Provides:

Section 14.3.1 of the collective bargaining agreement controls the maximum length of time – two years – for which a faculty member's leave of absence may be approved.  (Defs' Amended Answer, Doc. No. 49, ¶ 60).

Defendants' Fourteenth Defense provides:

The University exercised reasonable care to prevent any racially harassing behavior, and Plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the University to avoid harm otherwise.  Therefore, as a matter of law, Plaintiff may not raise a claim for racially hostile environment. (Defs' Amended Answer, Doc. No. 49, ¶63).

#### ELEVENTH DEFENSE

Plaintiff asserts he was not covered by the 2000-03 CBA, and even with the retroactive effective date, he cannot be deprived of rights that vested prior to the creation of the 2000-03 CBA. As this Court already determined that the 2000-03 CBA applied to Plaintiff, contained a two-year limitation on consecutive leaves of absence, and did not deprive Plaintiff of vested rights, summary judgment on this defense is denied.

#### FOURTEENTH DEFENSE

Both parties cite to the holding in *Burlington Industries v. Ellerth*, 524 U.S. 742, 765 (1998) for the proposition that Defendants can raise an affirmative defense to hostile work environment

claims if they can show "two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765.  Plaintiff asserts that a written policy prohibiting racial harassment must be disseminated by the University prior to the occurrence of the operative facts in order to satisfy the requirements of the affirmative defense, and that because a written policy was not in effect, Defendants did not exercise the reasonable care necessary to prevent discriminatory harassment and Plaintiff could not have known of any preventive or corrective opportunities.

Because the Court bifurcated the discovery and motions, the Court will deny Plaintiff's Motion as premature and allow Plaintiff to raise this issue at a later date.  Plaintiff may refile this Motion on Defendants' Fourteenth Defense after discovery on this issue.  Plaintiff's Motion is DENIED.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment on Counts One, Three, Four, Five, Six, Seven and Eight (Doc. No. 67) is GRANTED.  Plaintiff's Motion for Partial Summary Judgment (Doc. No. 76) is DENIED.  A telephone status conference is ordered for March 21 at 3:00 p.m. to discuss Count Two.

IT IS SO ORDERED.

        s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

March 14, 2007

30